# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| REGIS F. LUTZ, et al., | ) | CASE NO. 4:09-cv-2256 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| CHESAPEAKE APPALACHIA, LLC, et al., | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

Before the Court is defendant Chesapeake Appalachia L.L.C.'s renewed motion for partial summary judgment. (Doc. No. 136 ["Mot."])[1] Plaintiffs have filed a memorandum in opposition (Doc. No. 139 ["Opp'n"]), and defendant has filed a reply (Doc. No. 140 ["Reply"]). For the reasons discussed below, defendant's motion is granted.

## I. BACKGROUND

On September 30, 2009, plaintiffs Regis and Marion Lutz, Leonard Yochman, Joseph Yochman, and C.Y.V., LLC ("plaintiffs" or "lessors") filed their putative class action complaint[2] against defendants Chesapeake Appalachia, L.L.C. ("Chesapeake" or "lessee"), Columbia Energy Group, and NiSource, Inc.[3] (Doc. No. 1 ["Compl."].) Plaintiffs are lessors of interests in natural gas estates in tracts of land in Trumbull and Mahoning Counties in Ohio. (Compl. ¶¶ 1-5.) They

---

[1] Defendant also filed a Statement of Undisputed Material Facts ("SUMF") (Doc. No. 137), which plaintiffs have not specifically opposed, and an appendix of deposition transcripts (Doc. No. 138).

[2] Plaintiffs filed their motion for class certification (Doc. No. 119), but, upon the parties' joint motion, briefing was stayed pending resolution of the dispositive motion. (*See* Order, Doc. No. 124.)

[3] Columbia Energy Group and NiSource, Inc. have been dismissed, leaving Chesapeake as the sole defendant.

claim that their leases provide that the defendant will pay them a royalty equal to 1/8th the value of the gas produced each month, computed by multiplying the volumes produced by the market price of gas at the time of production and dividing the product by eight. (*Id.* ¶ 16.) Plaintiffs alleged that "[b]eginning in at least 1993," defendant began to deliberately and fraudulently underpay the full gas royalty due its natural gas lessors, "by (1) deducting post production costs from the royalty payments [the 'improper deductions' claim], (2) calculating the monthly royalty payments using a price that was less than the market price of the gas at the time of production [the 'Mahonia contracts' claim], and (3) calculating the monthly royalty payments using volumes that were less than the volumes actually produced [the 'line loss' claim]." (*Id.* ¶ 20; *see also* ¶ 65.) They further allege that, although the gas wells at issue produced oil in addition to gas, no oil royalties were ever paid. (*Id.* ¶ 66.)

This Court dismissed the entire complaint, on defendants' motion to dismiss, finding the contract claim time-barred under the four-year statute of limitations in Ohio Rev. Code § 2305.041, and finding no independent basis for the remaining tort claims. (*See* Memorandum Opinion and Order [Doc. No. 68] at 982.[4]) Plaintiffs appealed and the Sixth Circuit determined that the breach of contract claim in Count I of the complaint should survive a motion to dismiss because each monthly royalty underpayment would constitute a separate breach triggering a new accrual period, a question never decided by any Ohio court and the answer to which was gleaned by the Sixth Circuit from existing Ohio precedent. Thus, the court of appeals held "that plaintiffs are permitted to pursue their breach of contract claim pertaining to any underpayments of royalties that occurred within the four years prior to the filing of their complaint in September 2009." *Lutz v. Chesapeake*

---

[4] All page number references are to the page identification number generated by the Court's electronic docketing system.

*Appalachia, L.L.C.*, 717 F.3d 459, 470 (6th Cir. 2013). The court further held that plaintiffs "may be entitled to equitable tolling on the basis of fraudulent concealment[,]" but that "these are questions for summary judgment or for trial[.]" (*Id.* at 1078.) The court affirmed this Court's ruling in all other respects and remanded for further proceedings. (*Id.* at 1079.)

The parties filed cross-motions for summary judgment (Doc. Nos. 114 and 118), which the Court took under advisement, ultimately concluding, after consultation with counsel, that the following question should be certified to the Supreme Court of Ohio:

> Does Ohio follow the "at the well" rule (which permits the deduction of post-production costs) or does it follow some version of the "marketable product" rule (which limits the deduction of post-production costs under certain circumstances)?

(Doc. No. 130 at 3029.) The Court stayed all proceedings until the Ohio Supreme Court determined whether to accept the certified question. (*See* Doc. No. 131.) On July 13, 2015, in view of the Ohio Supreme Court's acceptance of the certified question, the case was administratively closed, subject to reopening. (*See* Doc. No. 133.)

The Ohio Supreme Court heard oral argument on January 5, 2016 and the case was submitted that day. On November 14, 2016, defendant advised the Court that a majority of the Ohio Supreme Court had ruled on November 2, 2016 as follows:

> Under Ohio law, an oil and gas lease is a contract that is subject to the traditional rules of contract construction. Because the rights and remedies of the parties are controlled by the specific language of their lease agreement, we decline to answer the certified question and dismiss this cause.

*Lutz v. Chesapeake Appalachia, L.L.C.*, 71 N.E.2d 1010, 1013 (Ohio 2016). Two justices filed dissenting opinions, with one suggesting that Ohio would follow the "marketable product" rule, *id.* (Pfeifer, J., dissenting), and the other suggesting that Ohio would follow the "at the well" rule,

*id*. (O'Neill, J., dissenting). (That, of course, was the very issue that this Court sought to have determined when it certified the question to Ohio's Supreme Court.)

On August 18, 2017, Chesapeake filed the instant renewed motion for partial summary judgment, again seeking summary judgment solely with respect to the "at the well" leases. Plaintiffs have not filed a renewed dispositive motion, although they have opposed Chesapeake's renewed motion.

In view of these procedural developments, the Court, without guidance from the Supreme Court of Ohio, shall now address defendant's renewed motion for partial summary judgment.

## II. DISCUSSION

### A.      Standard of Review

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

## B.     Analysis

Although the complaint originally set forth six different claims, only a single breach of contract claim (Count I) has survived the various court rulings. In Count I, plaintiffs allege:

60.     The named Plaintiffs restate and incorporate by reference the allegations of paragraphs 1-59 of this Complaint.

61.     Each named Plaintiff and member of the Plaintiff Class owns an interest in an oil and gas estate in real property [in] the State of Ohio and, at all times relevant to this Complaint, leased that interest to Chesapeake.

62.     Pursuant to said leases, Chesapeake was required to pay the named Plaintiffs and the other class members a royalty equal to 1/8th of the market value of the gas at the time of production (or highest price reasonably obtainable at the time of production) multiplied by the volumes of gas produced.

63.     Chesapeake had an affirmative duty to pay the named Plaintiffs and the other class members the true and correct royalty due them by virtue of said leases and/or by virtue of the duty of good faith and fair dealing underlying all contracts.

64.     Beginning in 1993, Chesapeake breached its lease obligations to the named Plaintiffs and the members of the Plaintiff Class by failing to pay them the full royalties due them under the leases.

65.     Chesapeake breached its lease obligations with the named Plaintiffs and the members of the Plaintiff Class by (1) deducting from the royalty payments various production charges not identified in the lease agreements, all the while stating in reports and documents issued to the named Plaintiffs and the members of the Plaintiff Class that there were zero dollars deducted for production charges; (2) calculating the royalty payments using volumes of gas that were less than the volumes of gas produced from the gas wells; and (3) calculating the royalty payments using a price of gas that was less than the market value of the gas at the time of production (or highest price reasonably obtainable at the time of production).

66.     Chesapeake further breached its lease obligations with the named Plaintiffs and members of the Plaintiff Class by paying no oil royalties even though the gas wells at issue produced oil as well as gas.

67.     By virtue of Chesapeake's underpayment of royalties in breach of its lease obligations, the named Plaintiffs and the members of the Plaintiff Class have suffered damages which, in the aggregate, exceed the minimum jurisdictional amount of this Court.

Chesapeake seeks partial summary judgment on the following issues: (1) on its counterclaim seeking a declaration that, to the extent plaintiffs have leases with royalty clauses valuing the royalty payment "at the well," royalties under such leases must be paid based on the value of gas "at the well," and not at any other location; (2) on its counterclaim seeking a declaration that it has complied with plaintiffs' "at the well" leases by paying a royalty based on the market value of gas at the wellhead; (3) on plaintiffs' "line loss" claim with respect to all of plaintiffs' leases; and (4) on plaintiffs' claim that the statute of limitations was equitably tolled due to fraudulent concealment.

### 1.     *Deducting a Pro Rata Share of Post-Production Costs (Issues 1 and 2)*

The first two issues on which Chesapeake seeks summary judgment are related and can be considered together. The Court notes, however, that it is deciding only the legal question raised by these two issues, not any factual question (if there is one after the legal issue is decided) of whether the dollar amounts paid by defendant at any given time were correct under the legal interpretation that is determined herein.

There are several leases at issue in Count I. The motion addresses only four of the leases, which contain the following language:

> 3.     The royalties to be paid by Lessee are: . . . (b) on gas, . . . produced from said land and sold or used off the premises . . . the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale. . . .

(*See* Doc. Nos. 136-3 & 136-4 ["Lutz Leases"] at 3092 & 3095, respectively; *see also* Doc. No. 136-5 ["Moss Lease"] at 3098; Doc. No. 136-6 ["Stanowski Lease"] at 3101.)[5]

The specific dispute focuses on how the above royalty provision should be interpreted and how royalties should be paid, when, as is often the case, the gas extracted from the wells on the lessors' land is sold at some point downstream, not "at the well." Some background and discussion about a split of opinion among various jurisdictions is set forth here to frame the discussion.

"Royalty" is a term of art in the oil and gas industry, generally defined as "a share of production, free of expenses of production." George M. Haley & Eric Maxfield, *11 Bus. & Com. Litig. Fed. Cts. 3d* (Robert L. Haig ed.) § 127.80 (2013) (citing Williams & Meyers, *Oil & Gas Law* § 970 (1996)). There seems to be no dispute that costs such as "those incurred drilling, operating and maintaining a well, as well as other costs incurred in order to extract gas from the earth and bring it up to the wellhead[,]" *Poplar Creek Dev. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 239 (6th Cir. 2011), commonly known as "production costs," are borne entirely by the lessee. *Lutz*, 71 N.E.2d at 1011.

At issue here is the calculation of the royalty when there are post-production costs. Post-production costs "reflect amounts expended by the lessee that add value to production in its raw state at the location of the wellhead prior to a final sale." Edward B. Poitevent II, *Post-Production Deductions From Royalty*, 44 S. Tex. L. Rev. 709, 714 (2003). These costs may generally be categorized into "gathering, compression, treatment, processing, transportation, and dehydration costs." *Id.*; *Lutz*, 71 N.E.2d at 1011.

---

[5] The record suggests that the Moss Lease is now owned by the Lutzes (*see* Doc. No. 136-17 ["Pls.' Resp. to Interrog. No. 1"] at 3227), and the Stanowski Lease is now owned by the corporate plaintiff, C.Y.V., LLC (*see, e.g.*, Doc. No. 136-19 ["Royalty Statement"]; Pls.' Resp. to Interrog. No. 1 at 3228).

When gas is sold downstream of the wellhead, Chesapeake pays the lessors a pro rata share of the downstream sales price of the gas, and may—depending on the circumstances of each well and each lease—allocate a pro rata share of the post-production costs against the royalty payment. For example, if Chesapeake is required to pay 1/8 of the sales as a royalty, then 1/8 of the post-production costs are allocated to the royalty and Chesapeake pays 7/8 of the post-production costs. (Doc. No. 136-2 ["Bowles Decl."] ¶ 16.) This is known as the "net-back" or "work-back" method. (*Id.* ¶ 17; Mot. at 3067.)[6] Chesapeake asserts that this process is permitted under the leases that contain the so-called "at the well" language.

As explained by the Sixth Circuit Court of Appeals, states that have addressed the question of how to treat post-production costs under leases with "at the well" language have divided into two schools of thought.

> . . . At one end of the spectrum is the view that, because the operator has an implied duty or an implied covenant to market the gas, all post-production costs must be borne by the operator. *See, e.g.*, *Garman v. Conoco, Inc.*, 886 P.2d 652, 653-54 (Colo. 1994) (holding that where a lease is silent with regard to how costs incurred post-production are to be borne, a lessee may not deduct costs required to make the mineral marketable). Poplar Creek [the lessor] advocates for this view, which the parties term the "marketable-product" rule.
>
> At the other end of the spectrum, several courts have held that while there is an implied duty or covenant to market the gas, this duty does not extend to expenses incurred in sales not at the wellhead; post-production costs are to be shared proportionately by the working interest and royalty owners. *See, e.g.*, *Schroeder*, 565 N.W.2d at 894 ("gross proceeds at the wellhead" contemplates the deduction of post-production costs from the sale price of the gas, based on the view

---

[6] Chesapeake's motion actually states that it "never takes deductions for post-production costs before paying royalties." (Mot. at 3068.) Rather, it claims to base the royalties it pays to plaintiffs "on the price it receives for the sale of gas [to] unaffiliated purchasers, or the price it receives for the sale of gas to an affiliated entity then known as Chesapeake Energy Marketing Inc. ("CEMI")." (*Id.*) "Thus, when gas is sold at or near the wellhead to unaffiliated third parties, Chesapeake calculates royalties based on the sales price received pursuant to third-party contracts with unaffiliated purchasers. And when the gas is sold at or near the wellhead to CEMI the price that is paid to Chesapeake Appalachia is based on the price CEMI sells the gas (typically a higher sales price) and includes post-production costs incurred by CEMI." (*Id.* at 3068-69; Bowles Decl. ¶¶ 20, 21.)

that "at the wellhead" refers to location for royalty valuation purposes). Chesapeake [the lessee] advocates for this view, which the parties term the "at-the-well" rule.

*Poplar Creek*, 636 F.3d at 240.

Defendant argues for application of the "at the well" rule, whereas plaintiffs advocate for application of the "marketable product" rule and, in particular, the version of that rule articulated in *Tawney v. Columbia Nat. Res., L.L.C.*, 633 S.E.2d 22 (W. Va. 2006). The question is one of state law; but the Ohio Supreme Court has not addressed it. *See Schmidt v. Texas Meridian Res., Ltd.*, No. 94CA12, 1994 WL 728059, at * 3 (Ohio Ct. App. Dec. 30, 1994) (construing leases that provided for payment of a 1/8 royalty interest, where the parties cited only cases from other jurisdictions that did, or did not, permit deduction of post-production costs) ("It was conceded that there is no decision by an Ohio court construing such lease provisions and we have found none in our own research.").

Therefore, this Court's task "is not to determine which approach is best, but rather to decide the approach that the [Ohio] Supreme Court would adopt if the issue were before it." *Poplar Creek*, 636 F.3d at 241 (citation omitted) (applying Kentucky law); *see also Beverage Distribs., Inc. v. Miller Brewing Co.*, 690 F.3d 788, 792 (6th Cir. 2012) (where federal jurisdiction is based on diversity, the court applies the substantive law of the forum state). Further, if the highest court of the state has not addressed an issue, "the court may rely on case law from lower state courts." *Poplar Creek*, 636 F.3d at 240. (citations omitted). Here, when decertifying this Court's question, the Ohio Supreme Court directed that "traditional rules of contract construction[]" should be applied. *Lutz*, 71 N.E.2d at 1013.

The Ohio Supreme Court has held that "[oil and gas] leases are contracts, and the terms of the contract with the law applicable to such terms must govern the rights and remedies of the

parties." *Harris v. Ohio Oil Co.*, 48 N.E. 502, 506 (Ohio 1897) (cited by *Lutz*, 71 N.E.2d at 1012); *see also Schmidt*, 1994 WL 728059, at * 4 ("Oil and gas leases are regarded and treated as contracts. Thus, they are subject to certain well-settled principles of contract law.")[7] (internal citations omitted). Interpretation of contract terms is a matter of law for determination by the Court. *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008); *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 148 (Ohio 1978) syllabus ¶ 1 ("The construction of written contracts and instruments of conveyance is a matter of law.").

"It is a well-known and established principle of contract interpretation that '[c]ontracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.'" *Lutz*, 71 N.E.2d at 1012 (quoting *Skivolocki v. E. Ohio Gas Co.*, 313 N.E.2d 374 (Ohio 1974)). "'When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.'" *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 361 (6th Cir. 2014) (quoting *Sunoco Inc. (R&M) v. Toledo Edison*, 953 N.E.2d 285, 292 (Ohio 2011) (applying Ohio law). "Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008) (citation omitted). "[W]hen circumstances surrounding an agreement invest the language of the contract with a special meaning, extrinsic evidence can be considered in an effort to give effect to the parties' intention." *Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Util. Comm'n*, 954 N.E.2d 104, 111 (Ohio 2011) (citations omitted) (quoted by *Lutz*, 71

---

[7] Ohio treats royalties as personal, not real, property. *Pollock v. Mooney*, No. 13 MO 9, 2014 WL 4976073, at * 3 (Ohio Ct. App. Sept. 30, 2014) (citing *Pure Oil Co. v. Kindall*, 156 N.E. 119, 123 (Ohio 1927) ("Royalty is personal property, and is not realty.")). This is consistent with the nature of gas, which, since it has a "migratory character, can [only] be acquired by severing [it] from the land under which [it] lie[s][.]" *Back v. Ohio Fuel Gas Co.*, 113 N.E.2d 865, 867 (Ohio 1953). Courts that have adopted the "at the well" rule conclude that "the lessee's duty [to market] has ended once gas is severed from the wellhead, and thus, any costs incurred subsequent to that physical removal are to be shared by the parties." *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 901 (Colo. 2001) (rejecting this view).

N.E.2d at 1012). As noted in the opinion of the Ohio Supreme Court, extrinsic evidence may include "'(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement.'" *Lutz*, 71 N.E.2d at 1012 (quoting *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201, 1208 (Ohio Ct. App. 1998)).

Plaintiffs argue that the "at the well" language is ambiguous  because it does not address how to treat deduction of post-production costs. (Opp'n at 3954-56.) For that proposition, they rely entirely upon *Tawney*, *supra*, and other non-Ohio cases. But, as pointed out by Chesapeake, "[i]t is black letter law in Ohio that '[c]ontractual language is ambiguous, only when its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two of more reasonable interpretations.'" (Reply at 3971, quoting *Carrizo (UTICA) LLC v. City of Girard*, No. 4:13CV00393, 2015 WL 1456583, at *6 (N.D. Ohio Mar. 30, 2015) (citation omitted).) In their opposition brief, plaintiffs fail to address this Ohio standard, much less explain why the meaning of "at the well" cannot be ascertained from the four corners of the lease.

This Court concludes that the Ohio Supreme Court would adopt the "at the well" rule, simply applying the clear and unambiguous language in the leases. As noted by courts that apply this rule, "[t]he issue can . . . be put in terms of *where* the gas is to be valued for purposes of determining plaintiff's royalty payments." *Schroeder*, 565 N.W.2d at 891 n.3 (emphasis in original) (where the lease provided for royalties based on "gross proceeds at the wellhead") (cited

by *Lutz*, 71 N.E.2d at 1014) (O'Neill, J., dissenting)[8]). Here, as in *Schroeder*, the use of the similar language "market value at the well" "appears meaningless in isolation because the gas is not sold at the wellhead and, thus, there are no proceeds at the wellhead." *Id.* at 894. "However, if the term is understood to identify the location at which the gas is valued for purposes of calculating a lessor's royalties, then the language . . . becomes clearer and has a logical purpose in the contract." *Id.*[9]

Plaintiffs also argue that the parties' course of performance gives meaning and context to the "at the well" language. They claim that post-production costs were never deducted prior to 1993, and that this is proof that the parties never intended that there be deductions from the royalties. (Opp'n at 3856-57.)

Most states that follow the "marketable-product" rule do so based upon a conclusion that, since the lease, in their view, is silent as to how post-production costs are to be handled, they must fall back on the implied contractual duties, including the duty to market the gas once it is extracted from the lessor's land, thus requiring the lessee to bear all costs of bringing the product to market. Although, absent an express disclaimer to the contrary, Ohio law generally recognizes implied covenants in oil and gas leases, including the covenant to diligently market, *Yoder v. Artex Oil Co.*, No. 14 CA 4, 2014 WL 6467477, at * 7 (Ohio Ct. App. Nov. 13, 2014),[10] the Ohio Supreme

---

[8] Justice O'Neill, in his dissent, stated that he would conclude that "[w]here a lease provides that the lessor's royalty is based on value at the well, Ohio follows the 'at the well' rule[,]" which he would further define as "the gross proceeds of a sale minus postproduction costs." *Lutz*, 71 N.E.2d at 1013-14 (O'Neill, J., dissenting).

[9] This interpretation is also consistent with Ohio's treatment of royalties as personal property. *See* n. 8, *supra*.

[10] *See also*, *Am. Energy Servs. v. Lekan*, 598 N.E.2d 1315, 1321 (Ohio Ct. App. 1992) (listing the following "generally recognized implied covenants in oil and gas leases": to drill an initial exploratory well; to protect the lease from drainage; of reasonable development; to explore further; to market the product; and, to conduct all operations that affect the lessor's royalty interest with reasonable care and due diligence).

Court has cautioned that an implied covenant "arises only when the lease is silent on [a] subject." *Harris*, 48 N.E. at 505.

Construing the lease under the "marketable product" rule would ignore the clear language that royalties are to be paid based on "market value *at the well*." Further, as noted by Justice O'Neill in his dissent, "application of the marketable-product rule runs the risk of giving the lessor the benefit of a bargain not made." *Lutz*, 71 N.E.2d at 1014 (O'Neill, J., dissenting) (also quoting *Schroeder*, 565 N.W. 2d at 887 ("[the lessors'] royalties would be increased merely as a function of [the lessee's] own efforts to enhance the value of the gas through postproduction investments that it has exclusively underwritten[]") (alterations in *Lutz*)).

Here, a close reading of the royalty provision, in light of Ohio's contract law, leads to the conclusion that the parties' intent was that the *location* for valuing the gas for purposes of computing the royalty was "at the well."[11]

Accordingly, the Court concludes that Ohio would apply the "at the well" rule. Therefore, defendant's motion is granted with respect to the legal question raised in its first two grounds for summary judgment.

---

[11] It is not clear that, at the time the leases were executed, sales other than at the wellhead *would* have, or *could* have, been contemplated. The Ohio Supreme Court correctly noted that "[t]he leases at issue were negotiated and signed prior to the culmination of deregulation of the natural gas marketplace by the Federal Energy Regulatory Commission in 1992[,]" *Lutz*, 71 N.E.2d at 1012 (citation omitted), and that "[t]he contractual relationship between the lessors and the lessee spans more than four decades." *Id.* at 1013. Before deregulation, "wellhead sales from the producer to the pipeline company were the predominant method by which natural gas was sold." (Doc. No. 136-10 at 3135 [*Kilmer v. Elexco*, 990 A.2d. 1147 (Pa. 2010), Amicus Brief of Bruce M. Kramer].) Therefore, it is likely that the intent (and expectation) of the parties at the time the leases were executed was that the gas would actually be sold at the wellhead, not elsewhere, and therefore, valuing gas "at the well" was not an ambiguous term. The fact that deregulation has changed the landscape is of no relevance where, as here, the parties have not renegotiated the leases to adapt to that change. The leases still say what they say, and the Court's role is to ascertain the parties' intent at the time the leases were executed.

## 2. *Royalties on Volumes Less Than Those Actually Produced (Issue 3)*

Plaintiffs also assert that defendant has failed to pay royalties on the full amount of the gas extracted at the well. In its motion, defendant characterizes this claim as a "line loss" claim and argues that courts have uniformly held that line loss claims are not actionable, regardless of whether the court applies the "at the well" rule or the "marketable product" rule. (Mot. at 3076.) Citing a number of cases, defendant argues that "[c]ourts consistently reject claims seeking recovery of royalties *on gas not sold*, regardless of the approach taken to royalty calculation." (*Id.*, emphasis added.) It asserts that, since it "does not receive revenues from these lost volumes, how can it be required to pay a lessor royalties on such nonexistent revenue from these lost volumes?" (*Id.* at 3077.)

Addressing this aspect of defendant's motion in a three-sentence argument, plaintiffs rely entirely upon their position that post-production costs (which, in their view, includes loss of volume) must be borne solely by the lessee. (Opp'n at 3959.) Defendant resists, asserting that plaintiffs have not responded to defendant's cited legal authority and have provided no support of their own for their line loss claim. (Reply at 3976.)

Plaintiffs have provided no evidence to support the allegations of line loss in their complaint. They have made no effort to refute defendant's legal arguments, which the Court finds persuasive. Even more importantly, now that the Court has determined that royalties are computed based on volume "at the well," not elsewhere, loss somewhere along the line is not relevant.

Accordingly, summary judgment with respect to plaintiffs' claim relating to payment of royalties on full volume (*i.e.*, "line loss") is granted.

### 3. *Application of Fraudulent Concealment Doctrine to Extend Limitations Period (Issue 4)*

Plaintiffs' complaint alleges breach of contract both for defendant's failure to pay royalties on the correct volumes of gas and for defendant's failure to pay according to true market rates, instead basing the rates on artificially low, fixed prices contained in two "forward sales" of gas under the so-called "Mahonia" contracts.

"The parties do not dispute that the applicable statute of limitations governing plaintiffs' contract claim is ORC § 2305.041, which . . . [is] four years[.]" *Lutz*, 717 F.3d at 464-65. This Court initially dismissed plaintiffs' claims as time-barred, concluding that they should have been brought by April 5, 2009. In its opinion reversing dismissal of this portion of the case, the Sixth Circuit concluded, first, that, because each monthly royalty payment is divisible for purposes of the statute of limitations, "plaintiffs are permitted to pursue their breach of contract claim pertaining to any underpayments of royalties that occurred within the four years prior to the filing of their complaint in September 2009[,]" *Lutz*, 717 F.3d at 470, and, second, that this Court had failed to consider plaintiffs' fraudulent concealment claim, which, if established, could be a basis for invoking the doctrine of equitable tolling of the statute of limitations. The court stated that "[p]laintiffs alleged that they 'rel[ied] on'—and therefore presumably read—the reports and documents that Chesapeake furnished to them[,]" *Id.* at 475, which arguably "omitted true information and contained intentional misrepresentations." *Id.* The court held:

> Plaintiffs allege that a reasonably prudent person would have had no way of knowing about the fraud due to the inaccuracies of the reports. If they are able to prove this allegation, they may be entitled to equitable tolling on the basis of fraudulent concealment. If in fact plaintiffs *did* have sufficient information to trigger their duty to investigate, then equitable tolling may not be appropriate. *Cf. Au Rustproofing*, 755 F.2d at 1237 (holding that the plaintiff's duty to exercise due diligence was triggered because plaintiff should have known about the fraudulent affidavits at issue based on a letter from the defendant to the plaintiff); *Craggett v.*

*Adell Ins. Agency*, 635 N.E.2d 1326, 1333 (Ohio Ct. App. 1993) (holding that the plaintiff's duty to exercise due diligence was triggered because information on the cover of an insurance policy "was sufficient to require a reasonable person who believed she was simply adding a name to an existing policy to inquire into the possibility of wrongdoing"). In either case, these are questions for summary judgment or for trial, and they should not be resolved on a motion to dismiss. *Where there is "some question as to the depth and scope of [the plaintiffs'] investigation, [the plaintiffs] should be allowed to proceed forward." Carrier Corp.*, 673 F.3d at 448 (reversing and remanding the district court's dismissal of a fraudulent concealment claim "at such an early stage of litigation and without the benefit of discovery").

*Id.* at 476 (emphasis added).

Defendant moves for summary judgment on the claim of fraudulent concealment arguing first that, despite the allegation of reliance in the complaint, the *record* shows that no plaintiff had ever made it a practice to look at the reports that came with their royalty checks, much less had ever relied upon them. Therefore, defendant argues, plaintiffs cannot establish the requisite "due diligence" required to pursue a fraudulent concealment claim. (Mot. at 3078, quoting *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 448 (6th Cir. 2012) (plaintiff cannot prevail on a fraudulent concealment claim "when it is obvious . . . that the plaintiff conducted absolutely no investigation").)

In reversing this Court's grant of a motion to dismiss on this claim, the Sixth Circuit pointed out that, at a minimum, reading the relevant documents is key to establishing fraudulent concealment. *Lutz*, 717 F.3d at 475 ("Plaintiffs alleged that they 'rel[ied] on' -- *and therefore presumably read* -- the reports and documents that Chesapeake furnished to them." (emphasis added)). Here, plaintiffs admitted that they received monthly royalty statements or "check stubs," which showed the basic information used for calculating their royalties, plus any deductions, but that they did not look at or rely upon any of this information. (*See* Doc. No. 136-11 at 3143-44; Doc. No. 136-13 at 3163 & 3164; Doc. No. 136-14 at 3180 & 3181; Doc. No. 136-15 at 3197-98

& 3201-04; Doc. No. 136-16 at 3213-14 & 3215-18.) When asked what they looked at on the check stubs, plaintiffs admitted they were only interested in the amount of money they were being paid. (*See, e.g.*, Doc. No. 136-14 at 3181 -- "Q. And what are you looking at on the check stub? A. How much money is it.")

Plaintiffs claim that their admitted failure to exercise due diligence was excused because defendant *concealed* information from them. They argue that "[a]s *Lutz* makes clear . . . there *is* no duty to conduct an investigation if there is no information available that would alert the plaintiff to the possibility of wrongdoing." (Opp'n at 3960-61, citing *Venture Global Eng'g Servs., LLC v. Satyam Computer Servs., Ltd.*, 730 F.3d 580, 588 (6th Cir. 2013) for the proposition that "doing nothing might be reasonable where nothing suggests to a reasonable person that wrongdoing is afoot.")

While it is true that *Lutz* held that plaintiffs may be entitled to equitable tolling of the statute of limitations if they are able to prove that "a reasonably prudent person would have had no way of knowing about the fraud due to the inaccuracies of the reports[,]" *Lutz*, 717 F. 3d at 476, the Sixth Circuit made that observation in the context of a motion to dismiss. *See also Venture Global Eng'g Servs.*, 730 F.3d at 588 (citing *Lutz* for the proposition that "whether there was fraudulent concealment was to be resolved later in the proceedings, after a factual record had been developed.") But this Court is now at the dispositive motion stage and plaintiffs have pointed to no evidence in the record that would support their allegations that the royalty statements or check stubs were inaccurate, much less that there was no publicly available way for them to check their accuracy.

Although plaintiffs now allege that defendant fraudulently concealed the fact that the price paid under the Mahonia contracts was lower than the Appalachian Basin Index price (the "TCO

Index") (which plaintiffs say is the controlling rate), they admit they never before checked or questioned the royalty statements or the unit price paid, even though the TCO Index is publicly and readily available. (*See, e.g.*, Doc. No. 136-32.) They claim that "[a]n examination of the check stubs . . . shows that there was no information on them to trigger a suspicion that . . . the price of gas was not the current market price." (Opp'n at 3959-60, citing check stubs at Doc. Nos. 114-18 through 114-22.[12]) But, at a minimum, if plaintiffs expect to toll the statute of limitations, due diligence requires that they had checked. All they needed to do was access the TCO Index and compare the price displayed on their check stubs to the index price. They admittedly never did so. Although plaintiffs were entitled to rely on defendant's accuracy in paying their royalties, they cannot say (for purposes of belatedly tolling the statute of limitations) that the information supplied was inadequate to allow them to protect their rights. All that *can* be concluded from this record is that the information was *unverified* by plaintiffs, not that it was *unverifiable*.

Furthermore, plaintiffs cannot claim that they were unaware of the two Mahonia contracts because they were first disclosed by Columbia Energy Group in publicly accessible Form 10-K filings with the Securities and Exchange Commission in 1999 and 2000. (Doc. No. 136-24 at 3275; Doc. No. 136-25 at 3279; *see also* Doc. No. 136-26 at 3283; Doc. No. 136-27 at 3286; Doc. No. 136-30 at 3295, 3296-97.) Moreover, plaintiffs did not need to know of the Mahonia contracts to determine whether they were being properly paid. They only needed to know the price actually paid and the index price they claim they were due. Plaintiffs never bothered to compare these two amounts by looking at readily available information.

---

[12] Doc. No. 114 was defendant's original motion for summary judgment, which was termed by the Court when the case was certified to the Ohio Supreme Court. This is the *only* record citation that plaintiffs include in their argument on this issue. Even so, these docket numbers contain 26 pages and plaintiffs have provided no pinpoint citation or identified what, in their view, is lacking in the documents.

Although the allegations of the complaint were ruled sufficient by the Sixth Circuit at the motion to dismiss stage of the proceedings, the court only directed that plaintiffs should be allowed to proceed because "there is 'some question as to the depth and scope of [the plaintiffs'] investigation[.]'" *Lutz*, 717 F.3d at 476 (quoting *Carrier Corp.*, 673 F.3d at 448) (alternations in original). This Court now has the indisputable answer to that question: the plaintiffs did *nothing* to investigate. They did not consider any information on the check stubs except the amount of royalties they were receiving. Additionally, in the face of all the record evidence pointed out by defendant in its motion for summary judgment, plaintiffs have offered *nothing* other than unsupported conclusory arguments.

Defendant is entitled to summary judgment on this issue. Plaintiffs have failed to establish that the doctrine of fraudulent concealment entitles them to tolling of the four-year statute of limitations.

### III. CONCLUSION

For the reasons set forth herein, defendant's motion for summary judgment (Doc. No. 136) is granted.

### IV. SUBSEQUENT PROCEEDINGS

In view of this ruling, the Court directs counsel to confer and to propose in writing by November 8, 2017, their joint suggestions as to how to proceed with the case, including re-briefing on the question of class certification; whether any additional discovery is required; whether another round of summary judgment motions would be helpful and/or warranted; whether there is any interest in attempting to resolve the case and, if so, by what means; and any other matter counsel would like to bring to this Court's attention. The Court will then conduct a telephone conference,

with counsel only, on November 14, 2017 at 12:30 p.m. Plaintiffs' counsel shall be responsible for placing the call to the Court's chambers after all counsel are on the line.

**IT IS SO ORDERED**.

Dated: October 25, 2017

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**